UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

STEPHANIE M.,[1]

         Plaintiff,

v.                                    Civil Action No. 4:21-cv-160

COMMISSIONER OF
SOCIAL SECURITY,

         Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Stephanie M. seeks judicial review of the Commissioner of Social Security's denial of her claim for disability benefits ("DIB") under the Social Security Act. Specifically, Plaintiff argues that the Commissioner's Administrative Law Judge ("ALJ") improperly evaluated medical opinion evidence from her treating providers and from the Social Security Administration's ("SSA") consultative examiner and medical expert. As a result, she argues that the ALJ's residual functional capacity ("RFC") determination is not supported by substantial evidence. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure.  This Report concludes the ALJ failed to adequately explain his assessment of the evidence and therefore recommends that the court grant Plaintiff's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the final decision of the Commissioner, and remand the case for reconsideration.

## I.   PROCEDURAL BACKGROUND

Plaintiff filed for DIB on April 23, 2019.[2]  (R. 20).  She alleged disability beginning March 1, 2018, based on numerous physical health conditions.[3]  (R. 20, 316).  The state agency denied her application initially and on reconsideration.  (R. 152–58, 168–70).  Plaintiff then requested an administrative hearing.  (R. 175–76).  The hearing was held on October 28, 2020.  (R. 77–96).  Counsel represented Plaintiff at the hearing, and impartial vocational expert ("VE") Mitchell Schmidt testified.  Id.  After

---

[2] Plaintiff filed a prior DIB application in July 2014, which was denied in September 2017 because she had engaged in substantial gainful activity during the alleged period of disability.  (R. 101–07).  In conformity with Albright v. Comm'r of the Soc. Sec. Admin., 174 F.3d 473 (4th Cir. 1999), the ALJ considered the prior opinion, noting that "evidence in the current claim warrants changes in the findings from the prior decision."  (R. 31–32).

[3] Plaintiff alleged disability due to blindness or low vision, corneal scarring in both eyes, fibromyalgia, degenerative disc disease, sciatica, positive antinuclear antibodies ("ANA"), cervical spine instability, spondylosis of the cervical region, a deviated septum, and arthritis.  (R. 316).

the hearing, the court referred the claim to a medical expert —
Charlene Mitchell, M.D. — for a review of Plaintiff's medical
records and completion of written interrogatories. (R. 44, 1780-
90). Following Dr. Mitchell's review, the ALJ held a supplemental
hearing on April 13, 2021, at which Plaintiff was again represented
by counsel. (R. 40-52). A different VE, Brian L. Bierly, as well
as medical expert Nitin P. Dhiman, M.D., both testified. Id.

On May 7, 2021, the ALJ denied Plaintiff's claims for DIB,
finding she was not disabled during the period alleged. (R. 20-
33). The ALJ found that Plaintiff did not have an impairment or
combination of impairments that met or medically equaled the
severity of one of the impairments listed in 20 C.F.R. Part 404,
Subpart P, Appendix 1. (R. 24). The ALJ also found that
Plaintiff's RFC permitted her to perform work within the national
economy. (R. 32). On October 14, 2021, the Appeals Council denied
Plaintiff's request for review. (R. 1-3).

On December 17, 2021, Plaintiff filed her complaint in this
court. Compl. (ECF No. 1). She seeks judicial review of the
Commissioner's final decision that she was not disabled, claiming
that the Commissioner committed an "error of law by denying Appeals
Council review of the decision by the Administrative Law Judge, or
otherwise to deny relief that was within the authority of the
Appeals Council." Id. ¶ 4 (ECF No. 1, at 2). On May 31, 2022,
Plaintiff moved for summary judgment. (ECF No. 15). Plaintiff

3

argues that the case should be reversed or remanded because the ALJ "failed to properly evaluate opinion evidence from Plaintiff's treating sources" and "failed to incorporate restrictions which [her treating sources] assessed into the RFC." Pl.'s Mem. L. Supp. Soc. Sec. Appeal ("Pl.'s Mem.") (ECF No. 16, at 1). As a result, Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence. Id. Plaintiff also argues that the ALJ erred in finding the opinions of the agency's consultive examiner and medical expert "not persuasive in regards to [her] manipulative limitations, despite their consistency with the record." Id.

On June 30, 2022, the Commissioner opposed Plaintiff's motion and moved for summary judgment. (ECF No. 17). The Commissioner argues that the ALJ followed the regulations in evaluating all medical opinion evidence, and that the ALJ's opinion is supported by substantial evidence. Mem. Supp. Def.'s Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Def.'s Opp'n") (ECF No. 18, at 1-2). Plaintiff replied. ("Pl.'s Reply") (ECF No. 19). After a review of the record, this Report considers each of these arguments.

## II.  FACTUAL BACKGROUND

Plaintiff was born on October 23, 1973, and at the time of the ALJ's decision, she was 47 years old. (R. 32). She meets the insured status requirements under the Social Security Act until December 31, 2024. (R. 22). She has not engaged in substantial

4

gainful activity since March 1, 2018, the alleged onset date.  (R. 23).  She has at least a high school education and reported past work as a financial adviser, leasing agent of an apartment community, and owner of a janitorial service.  (R. 317-18).

## A.   Plaintiff's Health Treatment

Plaintiff's arguments in this court do not require a complete review of her medical history, as she disputes only the ALJ's assessment of certain medical opinions.  These opinions primarily recommended work restrictions related to attendance, ambulation, and manipulation.

## B.   Opinion Evidence

### 1.   Plaintiff's Treating Physicians

Leading up to and during the alleged period of disability, Plaintiff received treatment from several different physicians working for various health care providers.  Each of the relevant physicians and the treatment they provided is explained below.

### a.   Hampton Roads Orthopedic Sports Medicine

On July 20, 2017, Plaintiff presented at Hampton Roads Orthopedic Sports Medicine ("HROSM") with complaints of carpal tunnel syndrome and tingling sensations in both of her hands.  (R. 408).  She was seen by Daniel R. Cavazos, M.D., to whom Plaintiff reported "moderate to severe numbness, paresthesias and pain in the right hand and left hand."  Id.  Dr. Cavazos conducted a physical examination and found Plaintiff positive for tenderness,

swelling, instability, deformities, subluxations, weakness, or atrophy in her right and left wrists. Id. He also found Plaintiff's range of motion to be limited in both wrists and noted that Plaintiff wore a splint on her right wrist. Id.

Plaintiff subsequently returned to HROSM on two occasions.[4] On July 25, 2017, Plaintiff was seen by Dr. Jeremy J. Hoff, D.O. for neck pain and widespread pain across her whole body. (R. 410). Dr. Hoff reviewed results from a 2015 cervical MRI, which showed "[m]ultilevel moderate foraminal stenosis, facet hypertrophy and joint effusion on the right at C3/4 and C4/5[,] suggesting underlying inflammatory arthropathy." Id. Additionally, he reviewed results from another cervical diagnostic test conducted in 2015, which showed "[m]ild anterolisthesis at C3/4-C5/6 with mild dynamic instability on lateral flex/ext view," as well as "degenerative facet spurring on the right C/45-C5/6 and left C3/4 and C4/5." Id. Dr. Hoff also conducted a physical examination. (R. 413). He found Plaintiff's range of motion in her neck to be moderately limited and measured her right wrist strength at 4/5 during extension and 3/5 during palmar flexion.[5] Id. On August

---

[4] Only the second of these appointments, which was Plaintiff's third appointment in total at HROSM, fell during the alleged period of disability.

[5] Palmar flexion is the "bending of the hand or fingers" towards to the surface of the palm. Palmar flexion, Stedmans Medical Dictionary (27th ed. 2000).

20, 2018, Plaintiff returned with low back pain and was seen by Dr. Cavazos. (R. 416). He reviewed her earlier radiology reports and images, noting that they "revealed grade II spondylolisthesis." Id.

### b.   Robert Kowalewski, M.D.

Plaintiff treated for joint pain with rheumatologist Robert Kowalewski, M.D. from March 23, 2017 until approximately September 24, 2019. (R. 423-68, 714). During that time, Plaintiff met with Dr. Kowalewski approximately nine times.[6] At each of these appointments, Plaintiff complained of "diffuse muscle and joint pain, most notably of her shoulder, neck, lower back," hips, knees, and feet. See (R. 425, 431, 436, 442, 448, 454, 461, 467, 715). At each visit, Dr. Kowalewski conducted a physical examination and made notes assessing Plaintiff's condition. At her initial appointment on March 23, 2017, the physical exam found that Plaintiff had normal and symmetrical reflexes, normal and symmetrical muscle strength, good range of motion in her upper and lower extremities, and normal range of motion in her neck. (R. 426). However, the exam also indicated that Plaintiff had multiple areas of muscular tenderness. Id. Dr. Kowalewski's assessment notes concluded that Plaintiff was suffering from fibromyalgia

---

[6] Only five of these appointments fell during the alleged period of disability. See Def.'s Opp'n (ECF No. 18, at 4).

syndrome, hypermobility arthralgia, cervical spine spondylosis and anterolisthesis.   (R. 424).   Dr. Kowalewski made largely similar findings at each of Plaintiff's subsequent appointments, with only a few minor deviations.[7]

On May 3, 2019, Dr. Kowalewski completed a medical source statement, which is a checkbox form listing certain questions about Plaintiff's functional limitations.   (R. 698-99); see also (R. 788-89).   He reported that Plaintiff had been diagnosed with elevated antinuclear antibodies ("ANA"),[8] chronic fibromyalgia syndrome, hypermobility arthralgia, anterolisthesis, spinal instability, and spondylosis of the cervical region.   (R. 698). He also noted widespread pain and tenderness, variable in severity and location, "per [the] patient."   Id.   Dr. Kowalewski opined that, out of a 40-hour work week, Plaintiff could be expected to miss up to three days of work per month due to her conditions.

---

[7] Specifically, at Plaintiff's appointment on April 23, 2018 and thereafter, Dr. Kowalewski's assessed Plaintiff with an elevated ANA of unclear significance.   (R. 448).   Dr. Kowalewski's assessment notes from Plaintiff's appointments on or after September 19, 2018 indicated that she had a history of nephrolithiasis. (R. 460).   Finally, at Plaintiff's appointment on February 4, 2019 and thereafter, Dr. Kowalewski's assessed Plaintiff with a skin rash.   (R. 466).

[8] Regular antibodies are "proteins that your immune system makes to fight foreign substances, such as viruses and bacteria."   ANA (Antinuclear Antibody) Test, MedlinePlus, https://medlineplus.gov/lab-tests/ana-antinuclear-antibody-test/ (last accessed October 23, 2022). Antinuclear antibodies, on the other hand, attack your "own healthy cells."   Id.   Elevated ANA is indicative of autoimmune disorders, such as rheumatoid arthritis.   Id.   ANA testing is often ordered for individuals that have symptoms of an autoimmune disorder, such as joint pain, stiffness, and swelling.   Id.

Id. He also indicated that Plaintiff's conditions caused extreme pain which would force her to be off task for 70% of an 8-hour workday. (R. 699). Additionally, Dr. Kowalewski opined that Plaintiff needs to elevate her legs above her waist, lie down, and take unscheduled breaks during an 8-hour workday beyond the usual fifteen-minute breaks twice per day and the lunch break. Id. Finally, Dr. Kowalewski noted that Plaintiff required the use of an assistive device to ambulate. Id.

### c. Stacy Tanner, M.D.

Plaintiff began treatment with rheumatologist Stacy Tanner, M.D. on November 6, 2020 and continued until approximately March 4, 2021. (R. 1793–1810). During that time, Plaintiff met with Dr. Tanner approximately three times, initially for joint pain, and subsequently for lupus. (R. 1793, 1799, 1804). At each visit, Dr. Tanner conducted a physical examination and provided assessment notes. (R. 1795–97, 1801–03, 1807–09). At Plaintiff's initial appointment on November 6, 2020, the physical exam showed that Plaintiff had a normal range of motion and was free of any musculoskeletal swelling or deformities. (R. 1808). Dr. Tanner also calculated Plaintiff's Beighton Score as 6/9.[9] Id. Based on

---

[9] The Beighton Score is a screening technique for hypermobility. See Outward v. Eaton Corp. Disability Plan for U.S. Emps., 808 Fed. App'x 296, 304 n.6 (6th Cir. 2020). The Beighton Score is calculated by testing the patient's ability to perform five simple maneuvers: (1) bend the thumb back to touch the forearm; (2) bend the fifth digit back beyond ninety degrees; (3) straighten the elbows past a neutral position; (4) straighten the knees past a neutral position; and (5) bend forward and

her findings, Dr. Tanner's assessment notes opined that Plaintiff had hypermobility syndrome and should undergo physical therapy. Id. Dr. Tanner's findings across Plaintiff's remaining two appointments in the relevant period were largely similar.[10]

On March 23, 2021, Dr. Tanner completed a medical source statement. (R. 1817–18). She reported that Plaintiff suffered from pain with all range of motion in her cervical spine and lumbar. (R. 1817). She also noted a history of carpal tunnel syndrome with hand weakness and paresthesias. Id. Dr. Tanner opined that, out of a 40-hour work week, Plaintiff would be expected to miss five or more days of work per month due to her conditions. Id. She also indicated that Plaintiff's conditions caused extreme pain which would force her to be off task for 70% of an 8-hour workday. (R. 1818). Additionally, Dr. Tanner reported that Plaintiff needs to elevate her leg two to eight times

_____

place the hands flat on the floor without bending the knees. Beighton score, Physiopedia, https://www.physio-pedia.com/Beighton_score (last accessed October 24, 2022). The first four maneuvers are each scored bilaterally on a two-point scale, with one point awarded for successful performance of the maneuver with each thumb, fifth digit, elbow, or knee. Id. The hands-to-floor test is scored unilaterally at either one or zero depending on successful performance of the maneuver. Id. The five sub-scores are then added together to get an overall Beighton Score on nine-point scale. Id. Dr. Tanner calculated Plaintiff's Beighton Score as 6/9 based on the following sub-scores: 1/2 in the thumb-to-forearm test, 2/2 in the fifth digit test, 0/2 in the elbow test, 2/2 in the knee test, and 1 in the hands-to-floor test. (R. 1808).

[10] At Plaintiff's second and third appointments on December 4, 2020 and March 4, 2021, respectively, Dr. Tanner's physical examination found that Plaintiff had a normal range of motion in her neck and was free of any musculoskeletal swelling or deformities. (R. 1796, 1802).

per day for fifteen to thirty minutes at a time and lie down two to eight times per day for fifteen to thirty minutes at a time. Id. She opined that Plaintiff needs to take unscheduled breaks during an 8-hour workday beyond the usual fifteen-minute breaks twice per day and the lunch break. Id. Like Dr. Kowalewski, Dr. Tanner noted that Plaintiff required the use of an assistive device to ambulate. Id.

In addition to these conclusions, Dr. Tanner also recommended various restrictions on Plaintiff's physical activities. Specifically, Dr. Tanner opined that Plaintiff's conditions would never allow her to stoop or climb and would limit her to occasional walking, infrequent sitting, and infrequent standing.[11] (R. 1817). Dr. Tanner also claimed that, during an average workday, Plaintiff would be limited to infrequently lifting/carrying one to five pounds and never carrying six pounds or more. Id. Finally, Dr. Tanner indicated that Plaintiff could never use her hands for fine manipulation or gross manipulation and could occasionally lift her arms over her shoulders. Id.

---

[11] Dr. Tanner made these recommendations using definitions that were provided on the medical source statement form. (R. 1817). Under those definitions, "frequently" means the patient "can perform the activity 1/3 up to 2/3 of an 8-hour workday." Id. "Occasionally" means that the patient "can perform the activity from very little up to 1/3 of an 8-hour workday." Id. "Infrequently" means that the patient "can perform very little [of the activity,] if at all, on some days." Id. "Never" means the patient "can never perform the activity." Id.

## 2.    Consultative Examiner, Shawne Bryant, M.D.

On August 30, 2019, Shawne Bryant, M.D. saw Plaintiff for a consultative examination and completed a medical consultant report. (R. 720-25). Plaintiff communicated that she had suffered from carpal tunnel syndrome since 2009, for which she wore braces at night and underwent left carpal tunnel release. (R. 720). She also reported positive ANA, 20-year lower back pain with sciatica, and cervical instability with spondylosis of the neck and lower back that radiated into her hips. Id. Additionally, Plaintiff mentioned arthritis in her wrists, hips, and left foot. (R. 720-21). She reported that she could sit for 30 minutes, stand for 50 minutes, walk 30 minutes, and lift up to 10 pounds. (R. 721). Plaintiff said she could "feed, bathe, dress herself, cook and do light house cleaning." Id.

During the physical examination, Dr. Bryant noted that Plaintiff could sit comfortably and get on and off the examination table without assistance. (R. 722). She had no spinal tenderness but had a positive straight leg test at 50 degrees bilaterally. Id. Her ambulation was normal; she could walk on her heels, toes, and in tandem; she could stand on one leg; and she could squat to 100%. Id. Her upper body muscle strength was 5/5 bilaterally, and her lower extremities were 4+/5 bilaterally. (R. 723). Her

12

Tinel's sign[12] was negative, but Plaintiff "refused to perform abduction and adduction of her hips due to lower back pain." Id. Regarding the consistency of Plaintiff's symptoms, Dr. Bryant noted that Plaintiff

> at times, was uncooperative throughout the evaluation, querying why the evaluation was necessary throughout the exam and some inconsistencies were noted throughout the evaluation such as her ability to squat 100% and rise without difficulty in view of her alleged lower back pain and hip pain and bilateral sciatica.[13]

Id.

Based on his evaluation, Dr. Bryant opined that, during a normal workday, Plaintiff could sit for 30 minutes at time and 6 hours total, walk for 15 to 20 minutes at a time and 3 hours total, and stand for 30 minutes at a time and 3 hours total. Id. He also concluded that Plaintiff could lift and carry 10 pounds frequently and 15 to 20 pounds occasionally. Id. Finally, he opined that she could "perform manipulative maneuvers

---

[12] A Tinel's sign is an indication of nerve irritation and "consists of a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve." Leonard v. Berryhill, No. 3:17-cv-730, 2019 WL 289099, at *7 n.6 (E.D. Va. Jan. 3, 2019).

[13] Plaintiff argues that Dr. Bryant was unaware of Plaintiff's diagnosis of hypermobility arthralgias, "which connotes hypermobile joints that . . . display a range of movement that is considered excessive." Pl.'s Mem. (ECF No. 16, at 6 n.1). She argues that his lack of awareness of Plaintiff's diagnosis "would presumably account for his concern over Plaintiff's ability to do a full squat despite sciatica and lumbar radiculopathy." Id.

occasionally;" could "bend, stoop, crouch, or squat at least occasionally;" and did not require an assistive device for ambulation.  (R. 723-24).

### 3.  Medical Expert, Charlene Mitchell, M.D.

After the initial hearing in October 2020, the ALJ requested that medical expert Charlene Mitchell, M.D. review Plaintiff's medical records.  (R. 44, 1780).  After reviewing the medical file, Dr. Mitchell completed a medical source statement reporting her opinions on Plaintiff's ability to perform physical work-related activities.  (R. 1781-90).  She opined that Plaintiff could frequently lift or carry up to 10 pounds, occasionally lift or carry up to 20 pounds, and never lift or carry more than 20 pounds.[14]  (R. 1781).  She also opined that Plaintiff could sit for two hours at a time without interruption, stand for 30 minutes at a time without interruption, and walk for 30 minutes at a time without interruption.  (R. 1782).  Dr. Mitchell indicated that, in an 8-hour workday, Plaintiff could sit for a total of six hours,

---

[14] Dr. Mitchell made these recommendations using definitions that were provided on the medical source statement form.  (R. 1781).  Under those definitions, "regular and continuous basis means 8 hours a day, for 5 days a week, or an equivalent work schedule."  Id.  "Continuously means more than two-thirds of the time."  Id.  "Frequently means from one-third to two-thirds of the time."  Id.  "Occasionally means very little to one-third of the time."  Id.  The form also included an option to select "never" if the patient could never perform the action in question. Id.  These definitions are slightly different than the definitions used on the medical source statements filled out by Dr. Tanner and Dr. Kowalewski.  Compare id. with (R. 698, 1817).

stand for a total of three hours, and walk for a total of three hours. Id. According to Dr. Mitchell, Plaintiff did not need to use a cane to ambulate. Id.

Regarding Plaintiff's manipulative limitations, Dr. Mitchell found that both Plaintiff's right and left hand could frequently handle, finger, and feel, but could only occasionally reach or push/pull. (R. 1783). She also found that Plaintiff could occasionally climb stairs and ramps, balance, stoop, kneel, and crouch, but never climb ladders/scaffolds or crawl. (R. 1784). Lastly, Dr. Mitchell opined that Plaintiff could perform certain activities, such as shopping, and could travel alone, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single handrail, prepare a simple meal and feed herself, care for her personal hygiene, and sort, handle, or use paper/files. (R. 1786).

Dr. Mitchell supported her opinions by noting "[e]vidence of spondylosis, foraminal stenosis and facet joint arthritis." (R. 1785). She also noted that Plaintiff suffered from "diffuse muscle and joint pain, most notably of her lower back, arms, legs," with varying — "but usually mild" — severity. Id. In Dr. Mitchell's view, Plaintiff's impairments did not meet or equal any impairment described in 20 C.F.R. Part 404, Subpart P, Appendix 1 because, in part, "there [was] no evidence of motor or sensory loss, and

[straight leg raise] testing [was] inconsistent." (R. 1789). Dr. Mitchell concluded that Plaintiff's limitations had been present since March 2018. (R. 1786).

## C.   Testimony Before the ALJ

The ALJ heard testimony at the initial hearing on October 28, 2020. (R. 79-95). Plaintiff's medical records were then referred to Dr. Mitchell, as discussed above. (R. 44, 1780). The ALJ subsequently heard additional testimony at the supplemental hearing on April 13, 2021. (R. 42-52).

### 1.   October 2020 ALJ Hearing

At the October 2020 hearing, the ALJ heard testimony from Plaintiff and an independent VE, Mitchell Schmidt. (R. 79-95).

#### a.   Plaintiff's Testimony

On direct questioning by her attorney, Plaintiff testified that that she could not sit while using the phone or looking at a computer screen, "do anything for long periods of time," or even do anything for "short periods of time" because her neck pain would flair up. (R. 83). She explained that these "flare-ups" came "out of the blue," happened "constantly," and prevented her from elevating her arms. (R. 84). Plaintiff testified that surgery had been "a failure" and that she would "take breaks constantly from anything" she did because her hands were always in pain and "going numb." (R. 84-85). She also testified that she could not "stand for long periods of time," and that she could only walk

around the block on good days.  (R. 85).  She said her pain was in her "neck, the back, the arms with the hands, and the feet."  (R. 87).  She testified that she could not perform any household chores, but she could shower and dress herself.  (R. 88).  She described that, in a typical day, she would "get up, grab something to eat, [and] make sure [her] kids are doing their homework and all their classwork."  (R. 89).

        **b.   Testimony from VE Mitchell Schmidt**

Mitchell Schmidt is an impartial VE.  (R. 79).  At the hearing, the ALJ's hypothetical posited a person with the same age, education, and work experience as Plaintiff who was capable of "light work" with the following limitations, as relevant to this motion:

> The individual can walk no longer than one block at a time on a flat, even surface.  The individual can . . . sit and stand for about 30 minutes at a time before having to change positions for a few minutes. . . .   The individual . . . [i]s limited to <u>frequent</u> fingering, grasping, handling, and reaching.[15]

(R. 91-92) (emphasis added).  The VE testified that "unskilled, sedentary and light jobs" would be available to such a person, identifying two unskilled light jobs — collator operator (DOT 208.685-010) with 44,000 jobs nationally, and mail sorter (DOT

---

[15] The ALJ also imposed limitations on some postural movements and limited the hypothetical individual to low-stress tasks.  (R. 91-92).  These limitations materially align with the RFC cited below.

222.687-022) with 105,000 jobs nationally — and two unskilled sedentary jobs — document preparer (DOT 249.587-018) with 20,000 jobs nationally, and cutter paster (DOT 249.587-014) with 12,000 jobs nationally.  (R. 92).

In response to questioning by Plaintiff's attorney, the VE testified that neither these jobs nor any other unskilled light or sedentary jobs would be available if the hypothetical was changed to occasional handling, fingering, and grasping.  (R. 94).  The VE also testified that an individual could be off task "up to 14 percent" of the time and still find unskilled employment, but would be unable to find employment if they would be absent more than once per month.  Id.

### 2.   Supplemental April 2021 ALJ Hearing

At the April 2021 hearing, Plaintiff testified that there had not been any changes in her medical condition since the last hearing.  (R. 46).  The ALJ then heard supplemental testimony from independent VE Brian L. Bierly and medical expert Nitin P. Dhiman, M.D.  (R. 46-52).  Neither of these experts testified at the first hearing in October 2020.

### a.   Testimony from VE Brian L. Bierly

At the hearing, the ALJ's hypothetical for VE Bierly posited a person with the same age, education, and work experience as Plaintiff with the following limitations, as relevant to this motion:

> [T]he individual . . . can sit about six hours
> within the eight-hour workday; stand about one
> hour in an eight-hour workday; [and] walk
> about one hour within the eight-hour workday.
> . . . Individual's limited to frequent
> reaching in all directions except for
> occasional overhead reaching. . . . The
> individual is limited to <u>occasional</u> fingering,
> handling, grasping and feeling.[16]

(R. 50) (emphasis added). VE Bierly testified that no "unskilled light or sedentary jobs" could be performed with these limitations. <u>Id.</u>

The ALJ then changed the hypothetical to "<u>frequent</u> fingering, handling, grasping and feeling," with no other changes. (R. 50–51) (emphasis added). VE Bierly then identified "sedentary" jobs that could be available, including final assembler (DOT 713.687-018) with 20,000 jobs nationally; inspector (DOT 669.687-014) with 19,000 jobs nationally; and table worker (DOT 739.687-182) with 18,000 jobs nationally. (R. 51). Following an additional query by the ALJ, VE Bierly testified that if the individual could only perform "frequent fingering, grasping, handling, and feeling" with one hand but not the other, no jobs would be available. <u>Id.</u>

   **b. Testimony from Medical Expert, Nitin P. Dhiman, M.D.**

Nitin P. Dhiman, M.D., is an impartial medical expert who reviewed Plaintiff's medical record prior to the April 2021

---

[16] The ALJ also imposed limitations on lifting and carrying and other postural movements, as well as some environmental limitations. (R. 50). These limitations materially align with the RFC cited below.

hearing.[17]  (R. 46).  Dr. Dhiman identified Plaintiff's diagnoses as degenerative disease of the spine, osteoarthritis, and blindness.  (R. 47).  He opined that Plaintiff's impairments did not meet or equal any impairment described in 20 C.F.R. Part 404, Subpart P, Appendix 1, but also acknowledged that she experienced "significant limitations" since the alleged onset date of March 1, 2018.  (R. 48).  Specifically, he identified the following limitations, as relevant to this motion:

> [W]ith respect to lifting and carrying it would be 20 pounds occasionally, 10 pounds frequently.  Sitting, standing and walking would be sitting six hours, standing and walking one hour each total in an eight-hour workday.  Climbing ramps and stairs would be occasionally.  Climbing ladders, ropes and scaffolds would be never.  Stooping, kneeling, crouching and crawling would be occasionally.  Reaching above the head would be occasionally bilaterally.  Reaching in all other directions would be frequently bilaterally.  Handling, fingering and feeling would be occasionally.

Id.  Dr. Dhiman clarified that he limited Plaintiff's fingering to occasional, rather than frequent, based on her carpal tunnel syndrome.  (R. 49).

### III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was

---

[17] Dr. Mitchell, who completed the prior interrogatories, was not available for the April 2021 hearing.  (R. 47).

supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017). Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial

evidence on the record, or the ALJ made an error of law. <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.  <u>ANALYSIS</u>

Plaintiff's brief identifies two errors in the ALJ's decision that she claims warrant remand. First, she contends that the ALJ's RFC determination is not supported by substantial evidence because he "failed to properly evaluate opinion evidence from Plaintiff's treating sources" and "failed to incorporate restrictions which [her treating sources] assessed into the RFC." Pl.'s Mem. (ECF No. 16, at 1). Plaintiff also argues that the ALJ erred in finding the opinions of the agency's consultive examiner and medical expert "not persuasive in regards to [her] manipulative limitations, despite their consistency with the record." <u>Id.</u> As explained below, this Report agrees that the ALJ's analysis of the medical opinion evidence provided by Plaintiff's treating providers, the agency's consultative examiner, and the impartial medical expert failed to satisfy the SSA rules' requirement that the ALJ explain the reasons for discounting medical opinion testimony as inconsistent with or not supported by the medical record. Accordingly, this Report concludes that remand is warranted, and therefore recommends that the Court vacate the Commissioner's decision and remand the case for reconsideration.

22

A.    **Framework for SSA Disability Evaluation**

A person may file for and receive disability insurance benefits under the Social Security Act if he or she meets the insured status requirements of 42 U.S.C. § 423(c)(1), is under the retirement age as defined in § 416 of the Act, and is under a disability as defined in § 423(d).  As relevant here, the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); accord 20 C.F.R. § 404.1505(a).  An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

SSA regulations set out a sequential analysis which ALJs use to make their determination.  20 C.F.R. § 404.1520(a)(4).  Specifically, the regulations direct the ALJ to answer the following five questions:

1.    Is the individual involved in substantial gainful activity?

2.    Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his

> or her physical or mental ability to do basic work activities?
>
> 3.   Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?
>
> 4.   Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?
>
> 5.   Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled. An affirmative answer to questions three or five establishes disability. The claimant bears the burden of proof during the first four steps; if the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(3); 404.1520b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and

present age." <u>Jolly</u>, 2017 WL 3262186, at *6 (citing <u>Hayes v. Gardner</u>, 376 F.2d 517, 520 (4th Cir. 1967)). Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing <u>King v. Califano</u>, 599 F.2d 597, 599 (4th Cir. 1979)).

**B.  The ALJ Decision Currently Before the Court for Review.**

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from her alleged disability onset date until the hearing date. (R. 23). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: connective tissue disease, disorders of the cervical and lumbar spine, carpal tunnel syndrome, hypermobility syndrome, and arthralgia. <u>Id.</u> At step three, the ALJ found that Plaintiff did not suffer from a listed impairment or combinations of impairments that met or medically equaled the severity of one of the listed impairments. (R. 24). The ALJ then developed a finding regarding Plaintiff's RFC. (R. 26). He determined Plaintiff was able

> to perform less than a full range of light work as defined in 20 [C.F.R. §] 404.1567(b). The clamant is limited to lifting and carrying from waist to chest level. The claimant is limited to occasional pushing and pulling. The claimant can walk no longer than one block at a time on a flat even surface. The claimant can sit/stand about 30 minutes at a time before changing positions for a few minutes. The claimant has to avoid crawling and climbing ladders, ropes, and scaffolds, but

she can perform other postural movements on an occasional basis.  The claimant is limited to low stress tasks with low stress defined as requiring work with no more than occasional change in the routine and work that allows her to avoid fast-paced tasks such as assembly line jobs involving production quotas.  Also, the claimant is limited to frequent interaction with the public and co-workers, this limitation is as a result of physical symptoms including pain.  The claimant is limited to <u>frequent</u> fingering, grasping, handling, and reaching.  The claimant has to avoid concentrated exposure to respiratory irritants and extreme temperatures and humidity.

<u>Id.</u> (emphasis added).  At step four, the ALJ concluded that Plaintiff could not perform past relevant work.  (R. 32).  At step five, in reliance on VE Schmidt and VE Bierly's testimony, the ALJ found unskilled light or sedentary work in the national economy Plaintiff could perform, and therefore found that she was not disabled.  (R. 32-33).

**C.    The ALJ's Committed an Error of Law in his Evaluation of the Medical Opinion Evidence from Plaintiff's Treating Providers.**

Plaintiff first argues that the ALJ erred in determining her RFC because he incorrectly evaluated opinion evidence from Dr. Kowalewski and Dr. Tanner.  Pl.'s Mem. (ECF No. 16, at 1).  The Commissioner responds, arguing that the ALJ followed the regulations in evaluating all medical opinion evidence, and that the ALJ's opinion is supported by substantial evidence.  Def.'s Opp'n (ECF No. 18, at 1-2).  Because the ALJ's evaluations of Dr. Kowalewski's and Dr. Tanner's opinions are not consistent with the

26

controlling regulations,[18] this Report concludes remand is necessary.

> **1.** **The ALJ's evaluations of Dr. Kowalewski's and Dr. Tanner's opinions are insufficient to satisfy 20 C.F.R. § 404.1520c(b)(2).**

Under the applicable regulations, the ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) . . . ." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers their overall "persuasiveness," id., and while the ALJ may consider many factors in evaluating persuasiveness, he or she must explain only "the most important factors" of "supportability and consistency," § 404.1520c(b)(2). Supportability evaluates whether a medical source supports his or her opinion with "objective medical evidence and supporting explanations," § 404.1520c(c)(1), while consistency evaluates whether "evidence from other medical sources and nonmedical sources" also support the source's opinion, § 404.1520c(c)(2).

These regulations are consistent with guidance from the Fourth Circuit, which has explained that, when crafting an RFC, the ALJ "must include a narrative discussion describing how the

---

[18] On January 18, 2017, the SSA adopted new rules for considering medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c. The new rules apply to all claims filed after March 27, 2017. Id. Because Plaintiff filed her claims on April 23, 2019, (R. 20), the new rules apply.

evidence supports each conclusion . . . ." <u>Mascio v. Colvin</u>, 780 F.3d 632, 636 (4th Cir. 2015) (quoting SSR 96-8, 1996 WL 362207 (July 2, 1996)).   In addition, the ALJ must provide evidence supporting his determination and "build an accurate and logical bridge" to his or her conclusion.   <u>Woods v. Berryhill</u>, 888 F.3d 686, 694 (4th Cir. 2018) (quoting <u>Monroe v. Colvin</u>, 826 F.3d 176, 189 (4th Cir. 2016)).   Without this explanation, the court must "guess about how the ALJ arrived at his conclusions" and cannot meaningfully review them.   <u>Mascio</u>, 780 F.3d at 637.

Here, when explaining his RFC determination, the ALJ first stated that he "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c."   (R. 26).   Then, assessing Dr. Kowalewski's opinion specifically, the ALJ found the opinion to be unpersuasive because

> the limitations assessed appear to be based on the claimant's subjective complaints that she needs to lie down or elevate her legs due to pain and fatigue.   Additionally, there is no indication in the record that she requires the use of an assistive device to ambulate nor is there indication in the record that she would miss three days of work per month for 12 continuous months as physical examinations are noted to be largely normal.

(R. 30).   The ALJ offered a similar explanation with respect to Dr. Tanner's opinion.   Specifically, the ALJ found Dr. Tanner's opinion to be unpersuasive because

the limitations assessed appear to be based on the claimant's subjective complaints that she needs to lie down or be off task. Additionally, there is no indication in the record that [Plaintiff] requires use of an assistive device to ambulate nor is there indication that she would miss five days of work per month as physical examinations are noted to be largely normal.

Id. The ALJ also noted Plaintiff's receipt of "largely minimal and conservative treatment for her impairments." Id.

Plaintiff insists that these explanations are insufficient because they fail to consider and explain the factors of supportability and consistency as required by § 404.1520c(b)(2). Pl.'s Mem. (ECF No. 16 at 12-16). On the other hand, the Commissioner argues that the ALJ's rationale adequately addressed the supportability and consistency factors. Def.'s Opp'n (ECF No. 18, at 20-22). For the reasons explained below, and on the extensive factual record presented in this case, I agree with Plaintiff.

Regarding the required supportability analysis, the Commissioner highlights Dr. Kowalewski's and Dr. Tanner's appointment records, which he claims "were devoid of any objective deficits in Plaintiff's extremities that would support the extreme limitations" recommended, and in fact contained contradictory physical examination findings demonstrating Plaintiff's "normal and symmetrical reflexes, good range of motion in bilateral upper and lower extremities, and normal and symmetrical muscle

strength." Def.'s Opp'n (ECF No. 18, at 20). Although Dr. Tanner did observe hypermobility in Plaintiff's hands, elbows, and knees on one occasion, the Commissioner emphasizes that she only recommended physical therapy — a conservative treatment plan that "did not support a finding of disability." Id. at 21. The Commissioner also claims that the explanations Dr. Kowalewski and Dr. Tanner provided to support their recommendations were "scant." Id. Regarding the required inconsistency analysis, the Commissioner argues that the findings made by Dr. Mitchell, Dr. Bryant, and state agency medical consultants Joseph Duckwall, M.D. and William Rutherford, M.D. all contradicted Dr. Kowalewski's and Dr. Tanner's findings regarding the length of time Plaintiff could stand, walk, and sit; the extent to which she could perform manipulative movements; her range of motion; and whether she required an assistive device for ambulation. Id. at 21-22.

While the Commissioner may be correct that these specific pieces of evidence support the ALJ's conclusion, it is the Commissioner — not the ALJ — who is identifying them. The ALJ's discussions of Dr. Kowalewski's and Dr. Tanner's opinions make no direct mention of either this evidence or the other medical evidence in the record that weighs in favor of Plaintiff's treating providers. This contradictory medical evidence included, but was not limited to: (1) Dr. Cavazos' finding of tenderness, swelling, instability, deformities, subluxations, weakness, or atrophy — as

30

well as limited range of motion — in both of Plaintiff's wrists, (R. 408); (2) Dr. Hoff's review of Plaintiff's previous cervical testing results and his measurement of Plaintiff's right wrist strength at 4/5 during extension and 3/5 during palmar flexion, (R. 413); (3) Dr. Cavazos' conclusion that Plaintiff's previous radiology reports and images "revealed grade II spondylolisthesis," (R. 416); (4) Dr. Mitchell finding "[e]vidence of spondylosis, foraminal stenosis and facet joint arthritis" and concluding that Plaintiff suffered from "diffuse muscle and joint pain, most notably of her lower back, arms, legs," (R. 1785); and (5) Dr. Dhiman's recognition of Plaintiff's diagnoses for degenerative disease of the spine, osteoarthritis, blindness, and carpal tunnel syndrome, (R. 47, 49).

Despite all this evidence, the ALJ was entitled to find Dr. Kowalewski's and Dr. Tanner's opinions unpersuasive if the record supported that conclusion. He was nonetheless obligated to explain his reasons for doing so. Here, the ALJ did not mention, let alone discuss, the contradictory evidence or cite the controlling SSA regulations when conducting his analysis. A blanket statement that he complied with the regulations, followed by discussion of only those aspects of the medical record that supported his conclusion about the persuasiveness of Dr. Kowalewski's and Dr. Tanner's opinions, is insufficient to satisfy § 404.1520c(b)(2)'s mandate that the ALJ explain the supportability and consistency

factors.   This is particularly so in light of extensive evidence suggesting the limitations were consistent with and supported by the medical record.   Absent more detailed conclusions regarding these components of the record, the opinion lacks the analysis needed to facilitate meaningful judicial review.

In support of her position, Plaintiff relies on Dowling v. Comm'r of Soc. Sec. Admin., 986 F.3d 377 (4th Cir. 2021).   Pl.'s Mem. (ECF No. 16, at 12-13).   In Dowling, the ALJ's decision "was bereft of any reference to the factors as a whole.   The ALJ simply declared that he possessed 'the discretion to give less [than controlling] weight' to the opinion of the treating physician." Dowling, 986 F.3d at 385.   Because the ALJ failed to address the regulatory factors, the Fourth Circuit reversed the ALJ's decision and remanded the case for further proceedings.   Id. at 385-87. Plaintiff argues that this case warrants remand because, like the ALJ in Dowling, the ALJ here "included no reference to the regulatory factors that were supposed to guide the analysis," and specifically, failed to explain the supportability and consistency factors as required by 20 C.F.R. § 404.1520c(b)(2).   Pl.'s Mem. (ECF No. 16, at 13).

The Commissioner attempts to distinguish Dowling, which was decided under the old SSA regulations as opposed to the revised regulations that apply here.   Def.'s Opp'n (ECF No. 18, at 22). He argues that, unlike the ALJ in Dowling who failed to consider

the regulatory factors, the ALJ here "thoroughly discussed evidence that provided a factual foundation for supportability and consistency findings." Id. It is not necessary to determine whether Dowling remains an appropriate precedent, as the difference in the new and old regulations is not material to the dispute here. And as explained above, regardless of whether the regulations were cited, the ALJ did not adequately discuss his reasons for finding Dr. Kowalewski's opinion unpersuasive. The extensive, relevant medical history not mentioned in his evaluation necessitated a more detailed analysis to support his findings on the opinions' supportability and consistency, 20 C.F.R. § 404.1520c(b)(2). Here, as in Dowling, the absence of that detailed analysis warrants remand.

**D.   The ALJ Committed an Error of Law in his Evaluation of the Medical Opinion Evidence from the Agency's Consultative Examiner and Medical Expert.**

Plaintiff also argues that the ALJ erred in finding the opinions of Dr. Bryant and Dr. Dhiman "not persuasive in regards to [Plaintiff's] manipulative limitations, despite their consistency with the record." Pl.'s Mem. (ECF No. 16, at 1). The Commissioner responds, arguing that the ALJ's evaluation was proper. Def.'s Opp'n (ECF No. 18, at 23). The ALJ found Dr. Bryant's and Dr. Dhiman's opinions as to Plaintiff's manipulative limitations unpersuasive because they were unsupported by Plaintiff's treatment records and inconsistent with the record as

a whole. (R. 30-31). Because the ALJ's evaluations of Dr. Bryant's and Dr. Dhiman's opinions are not consistent with the controlling regulations, and the manipulative limitations were critical to Plaintiff's ability to engage in any employment, this Report concludes remand is necessary.

1. **The ALJ's evaluations of Dr. Bryant's and Dr. Dhiman's opinions are insufficient to satisfy 20 C.F.R. § 404.1520c(b)(2).**

As explained above, under the applicable regulations, the ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) . . . ." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers their overall "persuasiveness," id., and while the ALJ may consider many factors in evaluating persuasiveness, he or she must explain "the most important factors" of "supportability and consistency," § 404.1520c(b)(2). Supportability evaluates whether a medical source supports his or her opinion with "objective medical evidence and supporting explanations," § 404.1520c(c)(1), while consistency evaluates whether "evidence from other medical sources and nonmedical sources" also support the source's opinion, § 404.1520c(c)(2).

Here, when explaining his RFC determination, the ALJ first stated that he "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the

requirements of 20 CFR 404.1520c." (R. 26). Then, assessing Dr. Bryant's opinion specifically, the ALJ found the opinion

> to be partially persuasive as the record
> supports that the claimant would be capable of
> performing a reduced range of light work based
> on full strength, normal gait and ability to
> squat. However, the undersigned finds the
> limitation of occasional manipulation is
> unpersuasive as it is not supported by normal
> physical examination findings, which showed
> intact sensation, negative Tinel's sign and
> normal range of motion of the wrist.

(R. 31). The ALJ offered a similar explanation with respect to Dr. Dhiman's opinion. The ALJ found Dr. Dhiman's opinion

> to be partially persuasive as the record
> supports the limitation to lifting and
> carrying up to 20 pounds as well as occasional
> stooping and crouching due to largely normal
> examinations and strength. However, the
> record does not support the limitation to
> occasional fingering and standing/walking for
> two hours total in an eight-hour workday as
> the claimant consistently has had normal gait
> and was noted to be capable of squatting to
> 100%. Additionally she had intact sensation,
> negative Tinel's sign and normal range of
> motion of the wrist. However, even if limited
> to this level the vocational expert testified
> there would be sedentary jobs the claimant
> could perform.

Id.

The Commissioner contends that the ALJ's reasoning with respect to each opinion satisfied his duty under § 404.1520c(b)(2) to explain the supportability and consistency factors. Def.'s Opp'n (ECF No. 18, at 23-25). Regarding the required supportability analysis, the Commissioner points to the ALJ's

notation of Plaintiff's intact sensation, negative Tinel's sign, normal range of motion of the wrist.  Id. at 24.  Regarding the required consistency analysis, the Commissioner highlights Dr. Mitchell's conclusion that Plaintiff could frequently perform manipulative maneuvers.  Id. at 24-25.  I disagree and conclude that the ALJ's explanation for each opinion on manipulative limitations is inadequate given the nearly unanimous view in the medical record that Plaintiff had significant manipulative limitations due to multiple impairments.

While the Commissioner is correct that the ALJ pointed to certain physical examination findings and Dr. Mitchell's interrogatories, there was extensive other medical evidence in the record consistent with and supporting the conclusion that Plaintiff should be limited to occasional hand manipulation as both Dr. Bryant and Dr. Dhiman opined.  This evidence included, but was not limited to: (1) Dr. Cavazos' finding of tenderness, swelling, instability, deformities, subluxations, weakness, or atrophy — as well as limited range of motion — in both of Plaintiff's wrists, (R. 408); (2) Dr. Hoff's review of Plaintiff's previous cervical testing results and his measurement of Plaintiff's right wrist strength at 4/5 during extension and 3/5 during palmar flexion, (R. 413); (3) Dr. Tanner's medical source statement noting a history of carpal tunnel syndrome with hand weakness and paresthesias, (R. 1817); (4) Dr. Kowalewski's

assessment notes concluding that Plaintiff had fibromyalgia syndrome, hypermobility arthralgia, cervical spine spondylosis, and anterolisthesis, see, e.g., (R. 424); and (5) Dr. Kowalewski's medical source statement reporting widespread pain and tenderness, as well as diagnoses of elevated ANA, chronic fibromyalgia syndrome, hypermobility arthralgia, anterolisthesis, spinal instability, and spondylosis of the cervical region, (R. 698).

Again, despite all this evidence, the ALJ was not required to find Dr. Bryant's and Dr. Dhiman's manipulative limitations opinions persuasive if the record supported that conclusion. But here, the ALJ did not discuss any of this contradictory evidence or explain his analysis using the metrics required by the controlling SSA regulations.

Moreover, the analysis the ALJ did conduct contains clear inconsistencies with the record. For example, when discussing Dr. Dhiman's opinion, the ALJ appears to opine that, "even if limited to [occasional fingering] the vocational expert testified there would be sedentary jobs available the claimant could perform."[19]

---

[19] The ALJ did not use the words "occasional fingering" in this sentence of his opinion. Instead, he used the phrase "this level." It is unclear from the ALJ's reasoning what "this level" means. The relevant passage of the ALJ's opinion, as already reproduced above, states:

> [T]he record does not support the limitation to occasional fingering and standing/walking for two hours total in an eight-hour workday as the claimant consistently has had normal gait and was noted to be capable of squatting to 100%. Additionally she had intact sensation, negative

(R. 31).  This conclusion is not supported by any evidence in the record.  Both VEs testified that only frequent manipulation would allow Plaintiff to adjust to other employment at the sedentary or light level.  Specifically, in response to questioning by Plaintiff's attorney, VE Schmidt testified that neither the jobs he identified requiring frequent hand manipulation, nor any other unskilled light or sedentary jobs would be available if the hypothetical individual was limited to occasional handling, fingering, and grasping.  (R. 94).  VE Bierly, posed with a hypothetical assuming occasional hand manipulations, similarly testified that no "unskilled light or sedentary jobs" could be performed with those limitations.  (R. 50).

---

Tinel's sign and normal range of motion of the wrist.  However, even if limited to <u>this level</u> the vocational expert testified there would be sedentary jobs the claimant could perform.

(R. 31) (emphasis added).
    At first glance, "this level" appears to mean "occasional fingering and standing/walking for two hours total in an eight-hour workday," which are limitations the ALJ mentions and explains in the two prior sentences. That reading, however, would be inconsistent with the ALJ's conclusion that the VE testified Plaintiff could perform sedentary jobs with those limitations.  While the VEs' testimony showed there would be sedentary jobs Plaintiff could perform with the <u>postural</u> limitation of two hours of standing/walking per workday, they both also testified that there would be <u>no sedentary jobs</u> available to Plaintiff with the <u>manipulative</u> limitation of occasional fingering.  (R. 50-51, 94).  The ALJ appears to have either (1) misunderstood the VEs' testimony, or (2) intended "this level" to mean only the postural limitations, in which case he failed to clearly explain his conclusion and address the VEs' contradictory testimony as to Plaintiff's manipulative limitations.

As Plaintiff also emphasizes, the ALJ's conclusion on the persuasiveness of Dr. Bryant's and Dr. Dhiman's opinions and failure to include their manipulative limitations in the RFC is based on a misplaced reliance on the manipulative limitations endorsed by Dr. Mitchell in her answers to the ALJ's interrogatories. Pl.'s Mem. (ECF No. 16, at 17–19). Dr. Mitchell's interrogatories opined that Plaintiff could frequently handle, grasp, finger, and feel, (R. 1783), whereas Dr. Bryant and Dr. Dhiman each found that Plaintiff could only perform these actions occasionally, (R. 48, 723–24). According to Plaintiff, the ALJ was incorrect to rely on Dr. Mitchell's findings at the expense of Dr. Bryant's and Dr. Dhiman's findings because the record sent to Dr. Mitchell for review did not include key portions of evidence — namely, MRI results from HROSM and Dr. Kowalewski's opinions regarding Plaintiff's work restrictions. Pl.'s Mem. (ECF No. 16, at 7 n.2, 17–19). Plaintiff claims that the MRI results provided "objective evidence of cervical spine pathology which could account for radiculopathy into the upper extremities resulting in restriction in ability to handle, finger, and feel." Id. at 18.

The Commissioner disagrees with this argument, pointing out that Dr. Mitchell's interrogatories reference Exhibit 1F, which includes the records from HROSM and Dr. Kowalewski's record. Def.'s Opp'n (ECF No. 18, at 25). He also argues that the no

physician of record diagnosed Plaintiff with radiculopathy, and therefore the MRI documents are not relevant to the extent they tend to show that Plaintiff suffered from radiculopathy. Id.

While the Commissioner is correct that Dr. Mitchell references Exhibit 1F, which includes records from HROSM, those records do not appear to include the results of Plaintiff's MRI. (R. 407-21). And while no treating provider had diagnosed Plaintiff with radiculopathy, the MRI results were still material to Dr. Mitchell's assessment of Plaintiff's recorded impairments, such as cervical spine spondylosis, (R. 698), and Plaintiff's manipulative capabilities. For those reasons, Plaintiff may be correct that the ALJ's reliance on Dr. Mitchell's opinion was insufficient to support his assessment of the contrary opinions by Drs. Bryant and Dhiman. As explained above, the Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390; see also Lewis, 858 F.3d at 868. Substantial evidence consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance. Laws, 368 F.2d at 642. That means that, under certain circumstances, one medical opinion standing on its own — such as Dr. Mitchell's interrogatories — may constitute "substantial evidence" in the face of several, contradictory opinions — such as Dr. Bryant's and Dr. Dhiman's opinions and the other medical evidence cited above. However, the

SSA regulations and Fourth Circuit precedent mandate that, when the ALJ relies on a lone opinion in the face of contradictory evidence, he explains his reasons for doing so. Here, the ALJ failed to do so and remand is the appropriate remedy.

**E. The ALJ's Failure to Properly Evaluate the Medical Opinion Evidence Was Not Harmless Error.**

Lastly, Plaintiff argues that she was harmed by the ALJ's failure to correctly evaluate the medical opinion evidence described above. The Commissioner argues that "[t]here is no reasonable probability that the ALJ would have granted benefits absent any error in the articulation of the supportability or consistency factors" given, among other things, "Plaintiff's generally normal physical examination findings and conservative treatment history." Def. Opp'n (ECF No. 18, at 27). I disagree.

> When confronted with an error committed by the ALJ, the Court must determine whether to apply the harmless error doctrine. The burden of establishing a harmful error rests on the party attacking the agency's determination. In determining the significance of an error, courts must consider, among other factors, an estimation of the likelihood that the result would have been different.

Ross v. Berryhill, No. 3:18-CV-42, 2019 WL 289101, at *12 (E.D. Va. Jan. 3, 2019), R. & R. adopted by 2019 WL 281191 (E.D. Va. Jan. 22, 2019) (cleaned up); see also Shinseki v. Sanders, 556 U.S. 396, 407 (2009).

The Commissioner's argument on this point is primarily confined to the evaluation of Dr. Kowalewski's and Dr. Tanner's opinions on Plaintiff's exertional limits and off-task opinions. VE Schmidt testified that being off-task for greater than 10% of the workday would eliminate the ability to perform Plaintiff's past work, and that for unskilled work, employers would only be willing to tolerate an employee being off-task for up to 14% of the workday. (R. 94). Dr. Kowalewski and Dr. Tanner each opined that Plaintiff's conditions would keep her off task for up to 70% of the workday. (R. 699, 1818). VE Schmidt also testified that missing work more than once per month would eliminate all employment opportunities. (R. 94). Dr. Kowalewski opined that Plaintiff's condition would cause her to miss up to three days of work per month, (R. 698), while Dr. Tanner opined that Plaintiff would miss five or more days per month, (R. 1817). The Commissioner argues that any failure by the ALJ to properly evaluate Dr. Kowalewski's and Dr. Tanner's opinions would not likely produce an RFC including the limits they recommended.

But with respect to the ALJ's evaluation of Dr. Bryant's and Dr. Dhiman's manipulative limitation opinions, the Commissioner's harmless error argument misses the mark. Dr. Bryant opined that Plaintiff could only occasionally perform manipulative maneuvers. (R. 723). Dr Dhiman similarly testified that Plaintiff was limited to occasionally handling, fingering and feeling because of her

carpal tunnel syndrome. (R. 48-49). Both VEs testified these limitations would be work-preclusive for Plaintiff. When the ALJ asked VE Bierly to assume no more than occasional hand manipulation, VE Bierly ruled out Plaintiff's past work and all other unskilled light or sedentary jobs. (R. 50.) It was only after the ALJ changed the hypothetical to reflect frequent hand manipulation that VE Bierly testified there would be jobs. (R. 50-51). Similarly, VE Schmidt testified that neither the jobs he identified in response to the hypothetical assuming frequent hand manipulation nor any other unskilled light or sedentary jobs would be available if the individual was limited to occasional hand manipulation. (R. 94).

Assessing the opinions from the agency's consultative examiner and medical expert in relation to the testimony from VEs Schmidt and Bierly, it appears that, had the ALJ properly evaluated Dr. Bryant's and Dr. Dhiman's opinions on Plaintiff's manipulative limitations, he might have found them more persuasive and thereby produced an RFC limiting Plaintiff to occasional fingering, handling, grasping and feeling. Such an RFC would have, in turn, left Plaintiff unable to perform any work within the national economy at either the light or sedentary level — according to both testifying VEs. I therefore conclude that Plaintiff may have been harmed by the ALJ's errors in assessing the medical opinion evidence in the record.

43

## V.   RECOMMENDATION

For  the  foregoing  reasons,  the  undersigned  recommends  that
the  court  GRANT  Plaintiff's  Motion  for  Summary  Judgment,  (ECF  No.
15),  DENY  the  Commissioner's  Motion  for  Summary  Judgment  (ECF  No.
17),  VACATE  the  final  decision  of  the  Commissioner,  and  REMAND  the
case  for  reconsideration.

## VI.   REVIEW PROCEDURE

By  copy  of  this  report  and  recommendation,  the  parties  are
notified  that  pursuant  to  28  U.S.C.  §  636(b)(1)(C):

1.   Any  party  may  serve  upon  the  other  party  and  file  with
the  Clerk  written  objections  to  the  foregoing  findings  and
recommendations  within  fourteen  (14)  days  from  the  date  this  report
is  forwarded  to  the  objecting  party  by  Notice  of  Electronic  Filing
or  mail,  see  28  U.S.C.  §  636(b)(1),  computed  pursuant  to  Rule  6(a)
of  the  Federal  Rules  of  Civil  Procedure.   Rule  6(d)  of  the  Federal
Rules  of  Civil  Procedure  permits  an  extra  three  (3)  days,  if
service  occurs  by  mail.   A  party  may  respond  to  any  other  party's
objections  within  fourteen  (14)  days  after  being  served  with  a
copy  thereof.   See  Fed. R. Civ. P.  72(b)(2)  (also  computed  pursuant
to  Rule  6(a)  and  (d)  of  the  Federal  Rules  of  Civil  Procedure).

2.   A  district  judge  shall  make  a  de  novo  determination  of
those  portions  of  this  report  or  specified  findings  or
recommendations  to  which  objection  is  made.

44

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).


/s/
Douglas E. Miller
United States Magistrate Judge
_____

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
November 1, 2022